[Nos. 7204-1-II; 7240-8-II.   Division Two.   July 15, 1986.]

ITT RAYONIER, INC., *Respondent,* v. PUGET SOUND
FREIGHT LINES, ET AL, *Appellants,* FACTORY
MUTUAL ENGINEERING ASSOCIATION,
*Respondent.*

WESTERN ELECTRIC COMPANY, INC., *Respondent,* v. PUGET
SOUND FREIGHT LINES, ET AL, *Appellants,*
FACTORY MUTUAL ENGINEERING
ASSOCIATION, ET AL,
*Respondents.*

*William R. Hickman* and *Reed, McClure, Moceri, Thonn & Moriarty,* for appellants.

*Richard C. Siefert* and *Lane, Powell, Moss & Miller,* for respondents ITT Rayonier and Western Electric.

*Frank Draper, Lane, Powell, Moss & Miller, David Antal,* and *Schwabe, Williamson, Wyatt, Moore & Roberts,* for respondent Crown Zellerbach.

*George Bovingdon* and *Clarke, Bovingdon & Cole,* for respondent Factory Mutual Engineering.

WORSWICK, C.J.—In 1980, an arson fire destroyed a warehouse at the Port of Tacoma. The arsonist was never identified; fire investigators later surmised that a transient had somehow gained access to the warehouse and had started the fire, using kerosene as an accelerant. The fire immediately triggered the warehouse sprinkler system, but it malfunctioned and failed to control the blaze. By the time fire fighters extinguished the fire, wood pulp and rolled paper worth nearly a million dollars had been destroyed. The wood pulp belonged to ITT Rayonier, Inc. The rolled paper had just been sold by Crown Zellerbach to Western Electric Co., Inc. It was being stored in the warehouse while in transit from Crown's mill in Washington to the Western Electric plant in Los Angeles.

Rayonier and Western Electric sued the warehouse operators, Puget Sound Freight Lines and Puget Sound Terminals, Inc. (collectively referred to as "Puget Sound"),

claiming that their loss resulted directly from the negligent failure of Puget Sound to secure the premises and maintain the sprinkler system. Puget Sound answered denying that warehouse security was inadequate, alleging that the sprinkler malfunction was not the proximate cause of the loss because no sprinkler system could have controlled a kerosene–based fire, and alleging as an affirmative defense that Rayonier and Western Electric knew the sprinkler system was inadequate and so assumed the risk that their goods would be destroyed by fire. Puget Sound also impleaded Crown, which had arranged to store Western Electric's paper in the warehouse, and Factory Mutual Engineering Association, which had been employed by the insurance carriers for Rayonier and Crown to inspect the warehouse's fire prevention equipment, alleging that both companies were liable for failing to warn Western Electric and Rayonier that the inadequate sprinkler system posed a serious fire risk.

The trial took 5 weeks. The bulk of the testimony concerned the sprinkler system. Expert witnesses explained how the system worked. A network of air–filled pipes covered the warehouse ceiling. Valves in the sprinkler heads were set to trip when exposed to intense heat. In a properly maintained system, water would flow from the sprinkler heads within 60 seconds of tripping. Proper maintenance meant regularly flushing the water mains, replacing sprinkler heads, and trip testing the system. To perform a trip test, the tester removes a sprinkler head at the farthest point from the mains and measures how long it takes for water to reach the open head.

Plaintiffs' experts testified that the sprinkler system was 64 years old, that its heads had never been replaced, that its mains had not been flushed for years, and that nobody had performed trip tests. Their post–fire investigation revealed that the sprinkler system failed because a valve controlling the flow of water into the system was rusted nearly shut. They testified that a trip test would have led to the discovery of the rusted valve.

Witnesses from Factory Mutual testified they had inspected the sprinkler system annually since 1971, acting on behalf of the insurers for Rayonier and Crown. Each year they filed reports indicating that the sprinkler system was inadequate and suggesting improvements. The evidence showed that Rayonier and Crown received copies of these reports. A Rayonier representative called the warehouse manager to ask whether he was implementing the changes Factory Mutual suggested. He was told that no capital improvements would be made because the Port of Tacoma planned to demolish the warehouse in a few years to make way for container yards. However, the warehouse manager assured Rayonier that the sprinkler system was properly maintained.

When Crown received the Factory Mutual reports, it considered other storage possibilities. However, it decided to continue using the Puget Sound warehouse because it was the least expensive and most convenient option for its purposes. Testimony on both sides indicated that neither Crown nor Rayonier was unduly concerned by the Factory Mutual reports because Factory Mutual had a reputation for suggesting unnecessary improvements. Its clients, the insurance companies, naturally wanted their insureds to maintain the best possible fire prevention equipment, and the reports reflected this desire.

No evidence connected Western Electric with the Factory Mutual reports. Puget Sound argued that Western Electric should be held to know of their contents because Crown read them, and Crown was acting as Western Electric's agent when it arranged for the paper to be stored in transit in the warehouse. The trial court rejected this theory, however, ruling as a matter of law that Crown was not acting as Western Electric's agent. It then dismissed all of Puget Sound's claims against Crown.

The court gave the jury 20 instructions and a special verdict form. Midway through deliberations, the jury sent the judge a note asking him to explain the difference between two interrogatories. The judge answered the question in

writing without notifying counsel.

The jury returned a verdict for plaintiffs. It found Puget Sound negligent in failing to maintain the sprinkler system, but not negligent in securing the warehouse against intruders. It found Factory Mutual not negligent in inspecting or reporting storage conditions.

Puget Sound's motion for a new trial or judgment n.o.v. was denied. Rayonier and Western Electric moved for prejudgment interest; the court awarded interest to Western Electric but not to Rayonier. Factory Mutual moved for an award of attorneys fees and costs; its motion was denied.

Puget Sound appeals the denial of its motion for judgment n.o.v. or for a new trial. Rayonier cross–appeals the denial of its motion for prejudgment interest. Factory Mutual cross–appeals the denial of its motion for attorneys fees and costs.

We are confronted with 34 assignments of error, which distill into 23 issues requiring discussion. Having concluded that the trial court committed prejudicial error with reference to instructions both given and refused on the issue of assumption of the risk and in failing to submit the agency issue to the jury, we reverse and remand for a new trial, but only between Rayonier and Western Electric as plaintiffs and Puget Sound as defendant. We also hold that neither plaintiff was entitled to prejudgment interest, and that Factory Mutual was not entitled to attorneys fees. In our discussion of the remaining issues, we dispose of a multitude of satellite questions and offer guidance for a new trial.

### ASSUMPTION OF THE RISK

Puget Sound makes two major contentions concerning the instructions on assumption of the risk. First, it asserts that the court incorrectly instructed the jury that one does not assume the risk of another's negligence. Second, it contends that both the instructions and the verdict form incorrectly represent assumption of the risk as a total bar

to recovery, rather than as a damage–reducing factor.[1] On the facts of this case, we agree with both contentions.

## A
### Risk of Another's Negligence

The trial judge drafted and, over objection of both sides, gave instruction 13:

> The plaintiffs, ITT Rayonier and Western Electric, assume all of the risks inherent in storing their goods in a 64 year old warehouse with 64 year old equipment. *The plaintiffs do not assume the risk of negligence or failure to use reasonable care by Puget Sound Freight Lines*
> . . .

(Italics ours.) This instruction is incorrect.

■■ It is true that one does not assume the risk of another's negligence merely by participating in an activity that carries some risk of harm. *See Regan v. Seattle*, 76 Wn.2d 501, 458 P.2d 12 (1969); *Wood v. Postelthwaite*, 6 Wn. App. 885, 496 P.2d 988 (1972), *aff'd*, 82 Wn.2d 387, 510 P.2d 1109 (1973). However, one who willingly and unreasonably encounters a known risk created by the negligence of another may be held to have assumed that risk. *Bailey v. Safeway Stores, Inc.*, 55 Wn.2d 728, 349 P.2d 1077 (1960); *Skarpness v. Port of Seattle*, 52 Wn.2d 490, 326 P.2d 747 (1958).

Rayonier and Western Electric concede that instruction 13 was erroneous. However, they argue that the instructions as a whole permitted Puget Sound to argue its theory of the case, and therefore the instruction was not prejudicial. We disagree.

The other "instructions" to which they refer consists of the interrogatory asking: "[w]hat was [*sic*] the damages to plaintiffs caused by any failure to properly maintain the

---

[1]The instructions did not explicitly state that assumption of the risk is a total bar to recovery. However, they did state that plaintiffs assumed *all* risks of storing their goods in a 64–year–old warehouse. Further, no instruction or interrogatory provided a means for the jury to reduce damages according to the degree of assumption of the risk. Therefore, they essentially represented assumption of the risk as a total bar.

sprinkler system[?]" This hardly cured the error; more likely, it compounded the error by confusing the jury because of the apparent conflict with instruction 13. They also allude to Puget Sound's argument by which defense counsel, with some ingenuity, attempted to fit the defense theory to the instructions. This still is not enough. Instructions are sufficient if—but only if—they (1) permit each party to argue its theory of the case; (2) are not misleading; *and* (3) when read as a whole, properly inform the jury of the applicable law. *Tiderman v. Fleetwood Homes,* 102 Wn.2d 334, 684 P.2d 1302, 45 A.L.R.4th 743 (1984). The instructions on assumption of the risk did not properly inform the jury of the applicable law.

## B
### Damage Reducing Factor

At common law, assumption of the risk, like contributory negligence, operated as a total bar to recovery. *See Skarpness v. Port of Seattle, supra.* In 1973, the Legislature enacted the so–called comparative negligence statute.[2] We conceive our task as determining the effect of that statute on the common law doctrine of assumption of the risk. To the extent that assumption of the risk is the equivalent of contributory negligence, the statute requires that it no longer operate as a complete bar to recovery. We conclude that assumption of the risk, as it may apply in this case, is the equivalent of contributory negligence.

Assumption of the risk has experienced a slow but steady fall from grace. *See Lyons v. Redding Constr. Co.,* 83

---

[2]Laws of 1973, 1st Ex. Sess., ch. 138, § 1, p. 949:

"Contributory negligence shall not bar recovery in an action by any person or his legal representative to recover damages caused by negligence resulting in death or in injury to person or property, but any damages allowed shall be diminished in proportion to the percentage of negligence attributable to the party recovering."

In 1981, the Legislature replaced this act with Laws of 1981, ch. 27, § 8, p. 117. The tort reform act, as it is called, explicitly classes unreasonable assumption of the risk as fault, which operates to reduce damages. The act applies only to causes of action arising after July 26, 1981, RCW 4.22.920, and therefore does not apply here.

Wn.2d 86, 515 P.2d 821 (1973); *Blackburn v. Dorta,* 348 So. 2d 287 (Fla. 1977). The doctrine developed during the industrial revolution in the context of the master–servant relationship, reflecting the general impulse of common law courts "to insulate the employer as much as possible from bearing the 'human overhead' which is an inevitable part of the cost—to someone—of the doing of industrialized business." *Tiller v. Atlantic Coast Line R.R.,* 318 U.S. 54, 58–59, 87 L. Ed. 610, 63 S. Ct. 444, 143 A.L.R. 967 (1943). Thereafter, it infiltrated nearly every area of negligence law. *Lyons,* 83 Wn.2d at 90.

In recent years, the courts have gradually moved toward the view, long espoused by legal commentators,[3] that the type of assumption of the risk involving a plaintiff's failure to exercise ordinary care should be abolished as a defense separate from contributory negligence.[4] In 1973, the Washington Supreme Court, deciding a case arising before the effective date of the so–called comparative negligence statute, held that assumption of the risk should have no continued existence as a separate defense in situations where the defense of contributory negligence is available. *Lyons,* 83 Wn.2d at 95. *Lyons* represents the controlling principle in this case.

Puget Sound's theory is that Rayonier and Western Electric knew the sprinkler system was not properly maintained, but nevertheless voluntarily assumed the risk of storing their goods in the warehouse. There is evidence in

---

[3]*See* 2 F. Harper & F. James, *Torts* 1162–92 (1956); James, *Assumption of Risk: Unhappy Reincarnation,* 78 Yale L.J. 185 (1968); Note, *Contributory Negligence and Assumption of Risk—The Case for Their Merger,* 56 Minn. L. Rev. 47 (1968); Wade, *The Place of Assumption of Risk in the Law of Negligence,* 22 La. L. Rev. 5 (1961).

[4]*Blackburn v. Dorta, supra,* listed 15 states as having merged assumption of risk with contributory negligence, although some, including Washington, retain express assumption of risk as an independent defense. *Blackburn,* 348 So. 2d at 289 n.3 (citing Alaska, Connecticut, Kansas, Maine, Minnesota, New Hampshire, New Jersey, New Mexico, North Dakota, Oregon, Texas, Utah, Washington, Wisconsin, and Wyoming).

the record to support this, and also to support another essential ingredient of the defense—that in assuming the risk, plaintiffs acted unreasonably, *i.e.,* failed to exercise ordinary care.[5]

On retrial, the court should instruct the jury on contributory negligence, and further instruct that a plaintiff may be charged with contributory negligence if it knowingly, voluntarily and unreasonably assumed the risk posed by the defective sprinkler system. The jury must also be instructed on how to compare the negligence of the parties and apportion damages accordingly.

### RULINGS INVOLVING CROWN ZELLERBACH

### A

### Agency

Puget Sound had trouble showing that Western Electric assumed the risk that the warehouse would burn because Western Electric never saw the Factory Mutual reports. Crown saw the reports, however, and because an agent's

---

[5]A road map of sorts is desirable to assist in sorting out the many mutations of this doctrine. Prosser and Keeton's useful analysis (W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on Torts* § 68 (5th ed. 1984)) has been appended for this purpose to our state law. *See Shorter v. Drury,* 103 Wn.2d 645, 655, 695 P.2d 116, *cert. denied,* ___ U.S. ___, 88 L. Ed. 2d 70, 106 S. Ct. 86 (1985). Their classification, and our view of the status of each class in Washington, follows:

1. *Express*: essentially contractual, bargained for; survives and is a complete bar to recovery. *See Shorter v. Drury, supra; Blackburn,* 348 So. 2d at 290.

2. *Implied primary*: fully known and accepted in advance; *e.g.,* sports participant or spectator; survives and is a complete bar. *See Ridge v. Kladnick,* 42 Wn. App. 785, 713 P.2d 1131 (1986). *See also Robillard v. P & R Racetracks, Inc.,* 405 So. 2d 1203 (La. Ct. App. 1981); *Duffy v. Midlothian Country Club,* 92 Ill. App. 3d 193, 415 N.E.2d 1099 (1980).

3. *Implied secondary reasonable*: plaintiff voluntarily encounters a known risk, but is reasonable in so doing; *e.g.,* working conditions at place of employment; *does not* survive as a defense. *See Lyons v. Redding Constr. Co., supra* (doctrine recognized as applying only if plaintiff at fault, *i.e.,* acted unreasonably); *South v. A.B. Chance Co.,* 96 Wn.2d 439, 443, 635 P.2d 728 (1981); *Siragusa v. Swedish Hosp.,* 60 Wn.2d 310, 373 P.2d 767 (1962).

4. *Implied secondary unreasonable*: plaintiff voluntarily but unreasonably encounters a known risk; subsumed under contributory negligence. *Lyons v. Redding Constr. Co., supra; Kucher v. Pierce Cy.,* 24 Wn. App. 281, 600 P.2d 683 (1979).

knowledge can be imputed to its principal (*Busk v. Hoard,* 65 Wn.2d 126, 396 P.2d 171 (1964)), Puget Sound tried to show that Crown acted as Western Electric's agent in arranging to store the goods at the warehouse. The trial court thwarted this strategy by ruling as a matter of law that Crown was not acting as Western Electric's agent. Puget Sound contends that agency was a jury question. We agree.

■ An agency relationship exists when one agrees to act for another under the latter's direction and control. *Snowflake Laundry Co. v. MacDowell,* 52 Wn.2d 662, 673, 328 P.2d 684 (1958). The principal need not actually exercise control; it suffices that he has the right to do so. *Cassidy v. Peters,* 50 Wn.2d 115, 119-20, 309 P.2d 767 (1957). Whether an agency exists is usually a question for the jury. The court may decide the question only if the facts are undisputed and lead to a single conclusion. *Graves v. P.J. Taggares Co.,* 94 Wn.2d 298, 616 P.2d 1223 (1980).

The record here contains enough evidence to raise a jury question on this issue. The testimony showed that the sales contract under which Western Electric bought the paper provided that it could designate routing plans. From this, a jury could conclude that Western Electric had the right to control where Crown would store the product in transit.[6]

## B
## Contribution

Puget Sound next contends that the trial court erred in directing a verdict against Puget Sound on its contribution claim against Crown. It argues that Crown was jointly and severally liable for the paper's destruction because (1) it violated a statutory standard of care by storing Western

---

[6]Western Electric inexplicably contends that this conclusion does not require reversal, arguing that Puget Sound may bring a separate contribution action against Crown under RCW 4.22.050. This is a non sequitur. The agency issue relates to whether Crown's knowledge of the Factory Mutual reports may be imputed to Western Electric and thus whether Western Electric assumed the risk. It has nothing to do with contribution by Crown.

Electric's paper in a warehouse known to have an inadequate sprinkler system, and (2) it violated a common law duty to warn Western Electric of the fire risk. We find no merit in either of these contentions.

■ The statute upon which Puget Sound relies, RCW 62A.2–504, is part of the Uniform Commercial Code and is inapplicable to this case. It provides that a seller has a duty to make a reasonable contract for transporting goods to the buyer. This duty is clearly contractual, affecting only rights between the parties to the contract of sale. It does not establish a standard of care for tort purposes, and creates no right of action in a third party such as Puget Sound.

Puget Sound has cited dubious authority for its contention that Crown had a common law duty to warn. It relies on *Wood v. Postelthwaite,* 6 Wn. App. 885, 496 P.2d 988 (1972), *aff'd,* 82 Wn.2d 387, 510 P.2d 1109 (1973), which held that when a golfer tees off, he has a duty to warn those in the zone of danger. The holding, and the authorities supporting it, impose a duty of limited application. They do not establish a general duty to warn. Moreover, *Wood* imposed this limited duty only upon the person who created the risk. As Crown did not create the risk that the warehouse would burn, it had no duty to warn even under a broad reading of *Wood.*

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

PETRICH and ALEXANDER, JJ., concur.